# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION
### CIVIL ACTION NO. 5:21-CV-00107-KDB-DCK

|  |  |
|---|---|
| **SHANNON COULBOURN PRESNELL,** | |
| **Plaintiff,** | |
| **v.** | **ORDER** |
| **SHARP ELECTRONICS CORPORATION,** | |
| **Defendant.** | |

**THIS MATTER** is before the Court on Defendant Sharp Electronics Corporation's ("Sharp") Motion for Summary Judgment (Doc. No. 29). The Court has carefully considered this motion and the parties' briefs and exhibits. For the reasons discussed below, the Court will partially **GRANT** and partially **DENY** the motion. The Court will grant the motion as to Plaintiff Presnell's claims of discriminatory pay and unlawful employment discrimination based on her sex. The Court finds that no reasonable jury could conclude that Sharp violated the Equal Pay Act, 29 U.S.C. § 207(d), when Presnell made more money than three of the four males who held her same position, and the lone comparator who made more money did not do "equal work" because he had a unique set of additional job responsibilities. Also, the evidence establishes that Presnell was terminated for violation of Sharp's corporate credit card policy and her conduct during the company's investigation of her credit card use, without regard to her sex. Therefore, Sharp is also entitled to summary judgment on Plaintiff's Title VII claims. However, the Court will deny summary judgment on Sharp's state law counterclaims, which the Court will decline to continue to exercise jurisdiction over and dismiss in the absence of any continuing federal claim.

1

# I.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *United States v. 8.929 Acres of Land in Arlington Cnty., Virginia*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Modern Mosaic, LTD v. Turner Construction Co*., *et al*., 946 F.3d 201, 206 (4th Cir. 2019). A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *8.929 Acres of Land,* 36 F.4th at 252. "A fact is material if it might affect the outcome of the suit under the governing law." *Id*., (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (when the nonmoving party "has failed to make a sufficient showing on an essential element of [his] claim with respect to which [he] has the burden of proof," summary judgment is warranted); *United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 178 (4th Cir. 2022). If the movant satisfies his initial burden to demonstrate "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmovant to "present specific facts showing that there is a genuine issue for trial." *8.929 Acres of Land,* 36 F.4th at 252, quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). Rather, the nonmoving party must establish that a material fact is genuinely

disputed by, *inter alia*, "citing to particular parts of the materials of record" and cannot rely only on "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." Fed. R. Civ. P. 56(c)(1)(A); *8.929 Acres of Land,* 36 F.4th at 252, quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

Still, summary judgment is not intended to be a substitute for a trial of the facts. *Anderson*, 477 U.S. at 249. In determining if summary judgment is appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (internal quotation marks omitted) (quoting *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)). In the end, the relevant inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## II.     FACTS AND PROCEDURAL HISTORY

### A.     Plaintiff's Employment and Compensation at Sharp

 Presnell first began working for Sharp in 2008 as a Sales Manager in its direct business to business ("B2B") sales division known as Sharp Business Systems ("SBS"). In 2016, Sharp promoted Presnell to General Sales Manager ("GSM") and she began working as a co-GSM of

the SBS-North Carolina branch[1] until 2018 when she became the sole GSM for the branch. (Doc. No. 29-2 ("Plaintiff Dep."), Vol. I, p. 29:12-20; Doc. No. 29-3 ("Osgood Dep.") pp. 12-14)**.** At the time, Brian Alspector was the SBS-NC branch President and Presnell's direct supervisor. (Plaintiff Dep., Vol. I, p. 36).

From 2018 to 2020, Sharp employed five GSMs – Presnell, Mike Ogolin, Todd Farin, Allen Fenters, and Brett Sponseller. (Osgood Dep. p. 19). Sharp promoted Sponseller from a Sales Manager to GSM of the SBS South Carolina branch ("SBS-SC") in April 2019. (Osgood Dep., pp. 19). However, when he was promoted Sharp did not hire a Sales Manager to take his place. Instead, Sponseller continued to directly supervise the sales employees he had been managing as a Sales Manager in addition to his duties as a GSM. None of the other GSMs directly managed sales employees, as distinguished from sales managers. (Osgood Dep., pp. 65, 101; Presnell Dep., Vol. I, p. 97:10-12). However, Presnell did supervise "enterprise account" managers (who headed a specialized sales team), which was typically done by branch presidents and not considered part of the main GSM role. (Osgood Dep. pp. 132-133). Presnell was the only GSM that supervised enterprise executives, although other GSMs supervised other specialized sales employees, including Business Development Representatives. (*Id*. at 133; Doc. No. 29-3, Osgood Dep., at p.132).

While Presnell was employed at Sharp, the GSMs were all paid annually under one compensation plan based on salary and bonus eligibility. (Osgood Dep., p. 22). While the calculation method was the same, each GSM received separate benchmarks and targets, including revenue and operating income, based on the size and performance of their respective branch

---

[1] The SBS-NC branch included offices in Hickory (where Plaintiff worked), Charlotte, Winston-Salem, Greensboro, Raleigh, Asheville, and Sandy Hills.

4

offices. (Osgood Dep., p. 23). Prior to 2019, GSMs were compensated primarily based on their branch's revenue, with a set base level of pay and a monthly bonus based upon that revenue. (Osgood Dep. pp. 22-23). In 2018, Presnell had the highest salary among GSMs and with her combined monthly commissions and annual bonuses, she also had the highest total earnings of all GSMs. (Doc. No. 29-4).

In 2019, SBS Vice President Anthony Sci developed and implemented a new GSM pay plan which was no longer primarily based on revenue but rather more focused on the profit of each branch. (Osgood Dep., pp. 23-24; Doc. No. 29-5). The 2019 compensation scheme included incentives not only for pure revenue, but also for operating incentives, and for other personalized incentives. (Osgood Dep. pp. 25-27). A further component of the plan was the implementation of threshold requirements that denied the GSMs a bonus if a certain threshold for an incentive was not reached. (Osgood Dep. pp. 23-24; 25-26). The plan also went from monthly commission payouts to a fiscal year payout every six months. (Osgood Dep., p. 25). To offset the drastic change, the GSMs were eligible to receive a monthly draw which Sharp determined in consultation with the Branch President of each GSM's respective branch office. (Osgood Dep., p. 60). Thus, each GSM continued to have different budgets and draws to fit the size and performance of their respective branches. (Osgood Dep., pp. 63, 91; Doc. No. 29-6).

Under the new pay plan, four of the five GSMs, including Presnell, received less annual compensation. (Osgood Dep., pp. 26-27). In 2019, Presnell's compensation dropped from first to second, behind Sponseller, but ahead of the other three male GSMs. (Doc. No. 29-4). One reason Sponseller made more money was that his SBS-SC branch office was the only branch that met its operating income target in 2019. (Osgood Dep., p. 64-65). Also, Sponseller earned 50% of the performance-based compensation he would have received as a Sales Manager for his

continued direct supervision of the sales employees he continued to manage in the SBS-SC branch office. (Osgood Dep. pp. 92-93, 102-105). Presnell did not receive any additional pay for her supervision of "enterprise account managers"; however, there is no evidence in the record concerning how much time or effort was involved in that duty.

Perhaps unsurprisingly, the GSMs did not like the 2019 compensation plan. (Plaintiff Dep., Vol. I, pp. 52:9; 86:7-8). The GSMs discussed their frustration with the proposed pay plan as early as October 2018 and again while they were attending a conference in New Jersey together before the plan went into effect. (Plaintiff Dep., Vol. I, pp. 55-57). In a group email with the other GSMs, Presnell stated, "[w]e are all on the same comp GSM comp plan and think we all agree. I'll try to get with Steve in advance to see if he can ease some concerns about what they are looking at." (Doc. No. 29-7). Later, Presnell met with Sci in the Spring of 2019 to try to prevent the new compensation plan from being implemented because the other GSMs made her the "captain of the squad." (Plaintiff Dep., Vol. I, pp. 54, 58, 72).

Later, after Presnell discovered Sponseller was receiving monthly commissions (for his continued direct supervision of sales employees), she reported this to Alspector, enlisting his help to try to increase her income under the 2019 pay plan. (Plaintiff Dep., Vol. I, p. 102). Presnell told Alspector the new plan was unfair to the GSMs but did not tell Alspector that she felt the pay issues or any pay discrepancies between her and Sponseller were based on her sex. (Doc. No. 29-8). Presnell also spoke with SBS Eastern Regional Vice President Steve Orander and Sci between August 2019 and February 2020, saying she was concerned that all GSM compensation (aside from Sponseller) had been negatively affected. (Plaintiff Dep., Vol. I, p. 106:5-6). Presnell testified that Orander told her he did not agree with the 2019 GSM plan change and committed to continuing the discussion about her compensation. (Plaintiff Dep., Vol. I, pp. 129-130). Presnell did not tell

Orander that she felt the pay issues or any pay discrepancies between her and Sponseller were based on her sex. (Doc. No. 29-9).

Based on the GSM complaints, Sharp reviewed the 2019 plan to determine whether an additional payout for the first fiscal half of 2019 was warranted. (Osgood Dep., pp. 139-140). Using 2019 achievement numbers, Orander and Osgood recalculated the payments already made to GSMs based on what each GSM would have received under the 2018 GSM compensation plan. If the compensation amount due was higher under the 2018 plan, Sharp paid the higher of the two calculations. (Osgood Dep., pp. 148-149). As a result of the recalculation, Sharp paid Presnell approximately an additional $30,000, while GSM Todd Farin received an additional $24,000. (Osgood Dep., pp. 145, 147).

At Sharp, Human Resources directors are responsible for handling employee complaints including those regarding employee pay and discrimination. (Osgood Dep., pp. 27:6-11; 35:13-18). The HR Director assigned to Presnell's SBS-NC branch was Larry Goldstein. (Osgood Dep., pp. 27:13-14). In March 2020, Presnell reached out to Goldstein regarding her compensation plan concerns because she considered him to be a trusted HR employee. (Plaintiff Dep., Vol. I, p. 142:11-18). During their discussion, Goldstein told Presnell to contact Susan Osgood, another HR employee, if she was unable to resolve her pay concerns. (Plaintiff Dep., Vol. I, p. 143:4-9). Presnell did not tell Goldstein that she felt the pay issues or any pay discrepancies between her and Sponseller were based on her sex. (Doc. No. 29-10).

On May 11, 2020, again Presnell emailed Osgood and Goldstein regarding her concerns about the pay plan as well as the dissatisfaction of all the GSMs with the 2019 plan. (Osgood Dep., p. 111; Doc. No. 29-11). Presnell did not reference unequal pay because of sex or gender discrimination in her email but did state that the 2019 compensation plan changes had a negative

impact on all the GSMs' compensation, which did not "sit well with any of [them]." (Doc. No. 29-11). Presnell also stated in her email that the GSMs made her the spokesperson on their behalf. *Id.*

**B.** **Plaintiff's Corporate Credit Card Use**

Sharp provides its GSMs a "corporate credit card" issued by American Express (the "AMEX" card) to use to pay for business expenses such as travel, lodging, car rental, and other charges related to customer relations and sales. (Doc. No. 32-1 ("Jawski Dep."), pp. 11). While Sharp arranges for and pays the fees on the AMEX card, the card is in the individual employee's name, the employee is responsible for paying any balance on the card and card statements are sent to the employee's home. Thus, Sharp does not "own" or owe any debt that an employee might incur with the card, and in cases where American Express has initiated actions against employees for collection, Sharp has not paid off such debts. (*See* Jawski Dep. pp. 67-68).

Employees are responsible for promptly providing reports detailing and supporting their business expenses paid through the AMEX card in a computer program named "Concur." If approved, Sharp reimburses the expenses directly to AMEX. (Jawski Dep. pp. 23, Doc. No. 29-13). Sharp's Travel and Entertainment ("T&E") policy prohibits employees from using their corporate AMEX card for personal expenses, (Jawski Dep., p. 26; Doc. No. 29-13), and any personal charges on the card must be identified as a personal expense on their Concur report as well as paid off directly to AMEX. (*Id.*).[2]

---

[2] Sharp testified that its prohibition on the use of the AMEX card for personal expenses was not based on any potential liability for charges but rather that utilization of the credit line for personal uses could preclude the employee from being able to use the card for the intended corporate expenses. (Jawski Dep. pp. 68-69).

The Internal Audit Department ("IAD") at Sharp performs operational audits of its multiple branches and divisions across the country, including T&E audits and AMEX card audits. (Jawski Dep., p. 9). Associate Director of Internal Audit Michelle Jawski leads the Department. (*Id*.). If an employee repeatedly charges personal expenses to her AMEX card, the Finance Department may escalate the matter to the IAD to monitor the employee's expenses. (Jawski Dep., p. 28). Also, an employee's delinquent monthly payments to AMEX, AMEX's assessment of late fees, carrying a high balance over time, or the failure to timely submit Concur reports might trigger scrutiny or an audit of the employee's use of the AMEX card. (Jawski Dep., p. 30). Further, as part of its internal audit policy, the IAD conducts one to two T&E employee audits each year, sampling the expense reports of approximately 40 employees to review for possible violations. (Jawski Dep., pp.30-31). The IAD also performs standard audits of three or four Sharp branch offices each year with the assistance of an outside accounting firm. (Jawski Dep., pp. 21; 33; 48-50).

As part of the 2018 audit rotation, the SBS-NC branch was chosen for a T&E audit, which was performed by an outside accounting firm, EisnerAmper. (Jawski Dep., pp. 21; 49). As part of this standard audit, Sharp or EisnerAmper pulled expense reports of 5-10 branch employees, including Presnell's, to review and verify the documentation provided. (Jawski Dep., pp. 22, 34, 38-39). The audit revealed Presnell had a large outstanding balance on her AMEX card, multiple late fees charged by AMEX, and that her attempted payments to AMEX for a large number of personal expenses had been declined by her bank. (Jawski Dep., pp. 42-43). Based on the accountant report that followed the audit, Sharp notified Presnell it was suspending her AMEX card on November 29, 2018, and put a written warning about the conduct in her personnel file. (Plaintiff Dep., pp. 169-170; Jawski Dep., p. 41; Doc. No. 29-14).

9

Ultimately, after emails with Sharp's Chief Financial Officer in which Presnell told the CFO that there had been a security breach on her bank account that caused the delinquencies, etc., Sharp issued Presnell a new AMEX card on February 1, 2019. (Plaintiff Dep., p. 171). As a condition of receiving the new card, Presnell agreed she would not use her AMEX to make any personal charges and would timely submit expense reports with proper supporting documentation. (Jawski Dep., p. 7:20-21; Plaintiff Dep., pp. 159; 193-194; Doc. No. 29-15). Sharp also flagged Presnell in Concur so each expense report she submitted would be reviewed by the Corporate Procurement and Concur Compliance teams before any payments were made to AMEX. (Jawski Dep., pp. 96-98).

In the Fall of 2019, Sharp suspended Presnell's AMEX card for a second time due to payment delinquencies and approximately $6,000 in personal charges. (Jawski Dep., pp. 76-77; 104, 242). Presnell told Sharp the delinquency was because of "a late fee due to an erroneous charge that is being handled by the fraud Department," (Plaintiff Dep., p. 243; Doc. No. 29-16 at Sharp 000033), and that the bank "is reimbursing all the charges." (Doc. No. 29-17 at Sharp 000043-000045; Doc. No. 29-18). Sharp requested Presnell provide any paperwork or correspondence she had with AMEX regarding these charges, but Presnell failed to do so. Instead, Presnell continued to claim she was the victim of a "fraudulent transaction" into late October 2019, asking a Sharp employee for help in submitting the alleged fraudulent charges via Concur to clear up her expense report. (Doc. No. 29-19 at Sharp 000042).

In April 2020, the IAD opened an investigation into Presnell's AMEX card usage after the Finance Department reported her ongoing AMEX compliance issues, which included unpaid personal charges. (Jawski Dep., pp. 98; 101). In reviewing Presnell's expense reports and AMEX statements for 2019, Jawski flagged several items including charges to On The Move

10

Delivery ("OTM Delivery") – a company owned by Presnell and her husband – made in August and September 2019. (Jawski Dep., pp. 108-109). In April 2020 discussions with Jawski, Presnell repeated the story she told Sharp in September 2019, again claiming her personal bank was going to submit reimbursement to AMEX for those charges. (Jawski Dep., pp. 111; 113-114). Jawski repeatedly requested Presnell provide support from her bank to show it would reimburse AMEX but Presnell failed to do so. (Jawski Dep., pp. 115-116; 120). Moreover, Presnell testified she knew the OTM Delivery charges were not fraudulent in April 2020, and yet still called the charges "fraudulent" in a May 11, 2020, email to Jawski in which she attached a statement highlighted to show Jawski the "AMEX fraudulent charges." (Plaintiff Dep., p. 266; Doc. No. 29-21). In May 2020, Jawski confirmed with AMEX that Presnell never opened or filed a fraud claim with AMEX related to the alleged "fraudulent charges." (Jawski Dep., p. 160-161; Doc. No. 29-20). The outstanding amount on Presnell's AMEX card including the OTM Delivery charges totaled approximately $9,000 and remained unpaid through Presnell's termination. (Jawski Dep., pp. 128-129).

Following the investigation, Jawski, Sharp's CFO, and General Counsel Kevin Fox prepared a final report summarizing the findings of the investigation. (Jawski Dep., pp. 131-133). Specifically, Sharp believed Presnell charged her AMEX card through her OTM Delivery Square account for her own personal use and then falsely claimed the charges were fraudulent. (Jawski Dep., p. 135:12-16). However, Sharp has never alleged that Presnell attempted to submit any personal expenses, including the OTM Delivery related charges, to Sharp for payment or reimbursement as business expenses.[3] (Jawski Dep. pp. 111-112).

_____

[3] In its memoranda supporting its motion, Sharp misleadingly refers several times to Plaintiff's personal AMEX card transactions as "possess[ing] Sharp's money" or taking money from Sharp.

In addition to the review of the AMEX card charges, Sharp conducted an email search of Presnell's work email account as part of the 2020 investigation. (Jawski Dep., pp. 139-140). Presnell's emails showed she borrowed money from multiple coworkers, family members of coworkers, and subordinates in her chain of command and about whom she may have input or feedback into performance reviews or bonuses the employee could receive. (Jawski Dep., pp. 146-148; 157-158). For example, Presnell entered into a Loan Agreement with Linda Greene, mother of subordinate Shana Williams, in May of 2018, in which she borrowed $36,000 from Greene. (Plaintiff Dep., pp. 202-203; 210). In January 2020, Presnell borrowed $5,000 from Janet Sims, another subordinate and admitted she had borrowed money from Sims on other occasions as well. (Plaintiff Dep., p. 214-216). And, Presnell borrowed money several times from another Sharp employee whom she supervised, Shannon Oxentine. (Plaintiff Dep., pp. 237-239).

## C. Plaintiff's Termination and the Filing of this Action

As a result of Presnell's misuse of her corporate AMEX card, her failure to provide support for or payment of the charges made to her corporate card, and her requests to borrow money from subordinates or subordinates' family members, Sharp terminated Presnell on May 20, 2020. (Plaintiff Dep., Vol. I, p. 151). On May 22, 2020, Presnell spoke with Osgood and Fox regarding her termination and tape recorded the phone call. (Doc. No. 29-26). During that call, Fox and Osgood shared some details of the IAD investigation with Presnell. She disputed Sharp's investigative findings but declined to provide an explanation for why the findings were incorrect.

_See, e.g._, Doc. No. 29-1 at pp. 13, 22-23. As noted above, Plaintiff, not Sharp, was at all times solely responsible for her personal charges so any such charges and any balance on the account did not reflect any taking of Sharp's funds or attempt to do so (in the absence of any claim that Plaintiff sought reimbursement for the charges as business expenses, which Sharp does not allege).

(*Id*. at pp. 4-5). Instead, as she had done throughout the course of Jawski's investigation, Presnell continued to claim the OTM Delivery charges were fraudulent and blamed Sharp for failing to help her resolve them. (Jawski Dep., pp. 161-162; Osgood Dep., pp. 126-127; Doc. No. 29-26 at p. 6).

Presnell filed this action on July 16, 2021, alleging that Sharp violated the Equal Pay Act by paying GSM Sponseller more than she received and violated Title VII of the Civil Rights Act of 1964, 42. U.S.C. § 20000e-2, by discriminating against her based on her sex and retaliating against her for complaining about Sharp's alleged discrimination.  In response, Defendant filed four counterclaims under North Carolina state law alleging that Presnell is liable to Sharp for conversion, embezzlement, breach of fiduciary duty and fraud based on her use of the AMEX credit card. Based on its Reply memorandum, Sharp seeks $9,294.92 as damages for these claims. *See* Doc. No. 37 at 10. Sharp alleges that this Court has jurisdiction over its state law claims under the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

### III.    DISCUSSION

#### A.  Plaintiff's Equal Pay Claim

 Plaintiff's first claim is that Sharp violated the Equal Pay Act ("Act" or "EPA") by paying her less than one of her fellow male GSMs. The statute forbids Sharp from:

> Discriminat[ing] ... between employees on the basis of sex by paying wages to employees ... at a rate less than the rate at which [the employer] pays wages to employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex ....

29 U.S.C. § 206(d)(1).

Case 5:21-cv-00107-KDB-DCK   Document 38   Filed 12/14/22   Page 13 of 24

To prove a violation of the Act, Presnell must make an initial (*i.e.*, prima facie) showing of three elements: (1) Sharp paid higher wages to an employee of the opposite sex who (2) performed equal work on jobs requiring equal skill, effort, and responsibility (3) under similar working conditions. *Spencer v. Virginia State Univ.*, 919 F.3d 199, 203–04 (4th Cir. 2019), *as amended* (Mar. 26, 2019) (citing *EEOC v. Maryland Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018). Proof of a prima facie case creates an inference of discrimination that stands even without the support of any evidence of discriminatory intent. *Id*. However, only once this inference exists does the burden shift to the employer to show that the pay differential was based on a factor other than sex. *Id*.

According to our Court of Appeals, "[e]quality under the Act is a demanding threshold requirement. It requires a comparator to have performed work 'virtually identical' (or the apparent synonym, 'substantially equal') to the plaintiff's in skill, effort, and responsibility." *Id*. (citing *Wheatley v. Wicomico Cty.*, 390 F.3d 328, 332–33 (4th Cir. 2004)). Similarity of work is not enough; instead, the Act's inference of discrimination may arise only when the comparator's work is equal to the plaintiff's. *Id*. Significantly, the Act does not ask (or provide a means for) courts to evaluate whether another employee's different (i.e. "unequal") work might have "comparable" value to the work the plaintiff performed. *See id.* (citing *Wheatley*, 390 F.3d at 333; *Sims-Fingers v. City of Indianapolis*, 493 F.3d 768, 771 (7th Cir. 2007) (Posner, J.) (explaining that, when trying to identify "comparable" pay for unequal work, there are "no good answers that are within the competence of judges to give").

Accordingly, the Court must first determine whether Presnell has established at least a factual dispute on whether she and her chosen comparator Sponseller had equal jobs; that is, "there must be evidence showing the jobs were equal in the strict sense of involving 'virtually

identical' work, skill, effort, and responsibility, not in the loose sense of having some comparative value." *Spencer*, 919 F.3d at 205. The Court finds that Presnell has failed to make the required showing – her job and Sponseller's were not equal.

First, there is no dispute that the compensation plan for all of Sharp's GSMs was the same, both in 2018 when Presnell had the highest compensation and in 2019, when she was paid less than Sponseller, but made more money than the three other male GSMs. And, while it is also undisputed that Presnell did not like the 2019 compensation plan under which four of the five GSMs made less money, her disappointment with the 2019 plan does not create an EPA violation because, again, the plan was the same for both male and female employees. Indeed, Presnell complained about the 2019 plan not only for herself but on behalf of several of her male colleagues. *See* Doc. No. 29-11.

Presnell argues that despite the equality of the compensation structure for the GSMs, Sharp can be held to have violated the EPA because Sponseller was given additional compensation for continuing to directly supervise sales employees after Sharp did not hire a Sales Manager to replace him when he became a GSM. However, this additional responsibility itself makes Sponseller's and Presnell's jobs "unequal" and thus any pay difference between them outside the prohibitions of the Act. Presnell does not contend that she retained direct responsibility for the sales employees she supervised as a Sales Manager.

Rather, she asks the Court to allow the jury to find that her supervision of "enterprise account managers" (who are not direct sales employees) in addition to her GSM duties was in effect "comparable" to Sponseller's additional responsibilities, thereby making their jobs

"equal." Even if that argument of *comparable* equality were plausible on the merits,[4] the Fourth Circuit has specifically held that the EPA requires that the two comparators have "virtually identical" / "substantially equal" jobs, which is simply not the case here. Put another way, even if Sharp should have paid Presnell some extra money because of her additional responsibility for "enterprise account managers," that fact is irrelevant to the clear conclusion that Sponseller's and Presnell's jobs were meaningfully *different* and thus not "equal" under the EPA.

Also, even if Presnell could meet her burden to establish a prima facie case, her EPA claim would still fail because Sharp has established that the salary difference between her and Sponseller was based on a "factor other than sex." 29 U.S.C. § 206(d)(1)(iv). As the defendant, Sharp bears the burden of establishing this affirmative defense. *Maryland Ins. Admin.*, 879 F.3d at 120. Thus, granting summary judgment on this ground requires the Court to find "that the proffered reason *did in fact* explain the wage disparity, not merely that it *could*." *Spencer*, 919 F.3d at 206. (emphasis in original).

Here, Sharp has made the required showing. First, it is undisputed that the GSM compensation system awarded compensation equally to male and female managers based on reaching established goals for operating income and Sponseller's branch was the only one to meet its goal. Second, Presnell acknowledges that Sponseller's additional compensation was based on his continued direct supervision of sales employees he managed as a Sales Manager,

_____

[4] While the Court need not (and could not) make the factual determination of whether Sponseller continuing to act as a Sales Manager (which is typically a separate position) and Presnell supervising one or more additional specialized managers (which has not been presented as a separate position nor shown to have taken a substantial amount of time) are comparable tasks, it appears unlikely that is true.

which is plainly a substantive "factor other than sex."[5] Therefore, Sharp has not violated the EPA both because Presnell and Sponseller did not engage in "equal work" and the difference between their total compensation is fully explained by factors other than sex.

### B. Plaintiff's Title VII Claims

#### 1. Wrongful Discharge

Under Title VII, it is unlawful for employers to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because such individual's race, color, religion, sex, or national origin." 42. U.S.C. § 20000e-2. Presnell alleges that she was discharged due to her sex. A plaintiff may establish a Title VII violation in two ways. First, a plaintiff may demonstrate through direct evidence that illegal discrimination motivated an employer's adverse employment action. Alternatively, a plaintiff may proceed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See generally Hill v. Lockheed Martin Logistics Mgmt., Inc*., 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc).

Direct evidence is evidence from which no inference is required. To show sex discrimination by direct evidence, a plaintiff typically must show discriminatory motivation on the part of the decisionmaker involved in the adverse employment action. *See Hill*, at 286–91. Such direct evidence would include a decisionmaker's statement that he terminated a plaintiff

---

[5] Even if Presnell believes either that Sponseller should not have been compensated for this additional work or she should have been similarly compensated for allegedly comparable work, it cannot be reasonably disputed that increasing Sponseller's pay because he continued to serve in his Sales Manager role – a decision and distinction which is unrelated to sex – reflects a "factor other than sex."

due to her sex. Presnell has not offered any direct evidence of sex discrimination. Instead, she relies on the *McDonnell Douglas* test to prove her claims.

A plaintiff's Title VII claim can survive summary judgment if the plaintiff raises a genuine issue of material fact under the burden-shifting framework established in *McDonnell Douglas*. Under this analysis, a plaintiff must first establish a prima facie case of discrimination. *See, e.g.*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). If a plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence that the defendant took the adverse employment action "for a legitimate, nondiscriminatory reason." *Burdine*, 450 U.S. at 254. If the defendant offers admissible evidence sufficient to meet its burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons but were a pretext for discrimination." *Hill*, 354 F.3d at 285; *see also Adams v. Trustees of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] ha[s] to prove 'both that the reason was false, and that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)).

The elements of a prima facie claim of discrimination under Title VII are well established. "The plaintiff must demonstrate: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007) (citing *McDonnell Douglas*, 411 U.S. at 802); *Goode v. Cent. Va. Legal Aid Soc. Inc.*, 807 F.3d. 619, 626 (4th Cir. 2015); *Redmon v. Flexsol Packaging Corp.*, No. 519CV00124KDBDSC, 2021 WL 1109361, at \*5–6 (W.D.N.C. Mar. 23, 2021).

18

Presnell's membership in a protected class, job performance and termination are not disputed. At issue here is the fourth element – Sharp contends that Presnell has not shown that she suffered different treatment from similarly situated male employees. The Court agrees. All parties acknowledge that Sharp's corporate AMEX card policies apply to all employees, regardless of sex. However, Presnell argues that the policies were applied differently to male employees who were not terminated when they used their AMEX card for personal charges that violated the policy. But, Presnell must do more than show that Sharp did not terminate all the male employees who were investigated for misuse of their AMEX card. She must establish that those male employees were "similarly situated," which she has failed to do.

The scope of Presnell's misuse of her AMEX card as well as her lack of candor and cooperation during Sharp's investigation easily distinguishes her circumstances from her male comparators.[6]  Presnell's AMEX card was suspended twice, in 2018 and again in 2019, for multiple problems with her account and violations of Sharp's T&E policy. Also, Presnell falsely claimed that her account problems were the result of fraudulent activity and failed to provide documentary support when it was requested.  In contrast, Sharp's investigation into one of the comparators revealed no wrongdoing, another investigation was not fully pursued because the employee had already been terminated (three years earlier) for other reasons and no description of the nature of alleged wrongdoing appears in the record for the final comparator. Therefore, Presnell has not proffered any facts from which a jury could find that "similarly situated" male

---

[6] The Court disagrees with Sharp's argument that the male employees Presnell cites as comparators should not be viewed as such because they were upper-level managers. Sharp does not explain why it would (or how it properly could) investigate and discipline an employee for the same misuse of a corporate credit card differently based only on their managerial level. Accordingly, the Court accepts Plaintiff's reference to the upper-level male managers as comparators for this purpose, even though it finds that none of them were "similarly situated" with respect to Plaintiff.

19

employees were treated differently[7] and she has failed to prove a prima facie case of discrimination.

Further, even if Presnell had established a prima facie case, the record is devoid of any evidence from which a jury could reasonably conclude that Sharp's decision to terminate her employment for the legitimate non-discriminatory reasons given was a pretext for intentional discrimination based on her sex. Simply put, Presnell has offered no evidence that her sex played any role in her termination or any reason that Sharp would do so. Thus, Sharp is entitled to summary judgment on Presnell's claim of wrongful termination both for failure to prove a prima facie case and pretextual discrimination.

2. Retaliation

Finally, Presnell claims that she was terminated in retaliation for her opposition to Sharp's discriminatory conduct. Title VII prohibits an employer from discriminating against its employee because she "has opposed any ... unlawful employment practice" under Title VII. 42 U.S.C. § 2000e–3(a). As with her wrongful termination claim, Presnell may support a retaliation claim in violation of Title VII either through direct and indirect evidence of an intent to retaliate, or through the burden-shifting framework of *McDonnell Douglas*. *See Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). Here, Presnell has offered no direct or indirect evidence of retaliatory animus, so she must proceed under the *McDonnel-Douglas* framework.

---

[7] Moreover, Presnell admits she was also terminated because she obtained loans from employees who she supervised, thereby creating at least the appearance of a conflict of interest. This wholly different reason for her termination further separates her circumstances from her male comparators.

Under this framework, a plaintiff must first make a prima facie case of retaliation. *Foster*, 787 F.3d at 250. To do so, Presnell must show that "(1) she engaged in protected conduct; (2) an adverse action was taken against her by [Defendant]; and (3) there was a causal connection between the first two elements." *Ulrich v. CEXEC, Inc.*, 709 F. App'x 750, 753 (4th Cir. 2017) (per curiam). Then, if the defendant offers a legitimate, non-discriminatory reason for the action in question, Plaintiff must prove by a preponderance of the evidence that the proffered reason was pretextual. *Id.*

Presnell's retaliation claim fails as a matter of law because she cannot establish either the first or the third element of a prima facie retaliation claim. First, the conduct for which Sharp allegedly retaliated against her is not "protected activity" within the meaning of Title VII. "Title VII applies solely to employment discrimination based on the specific protected categories of race, color, sex, religion, and national origin." *See King v. Seaboard Coast Line R.R. Co.*, 538 F.2d 581, 583 (4th Cir. 1976). Title VII does not cover other types of discrimination or mistreatment in the workplace, regardless of how unfair the alleged conduct may be. *Id.*

Title VII recognizes two forms of protected activity: (1) "opposition" activity, i.e., "oppos[ing] any practice made an unlawful employment practice"; and (2) "participation" activity, i.e., "ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018); *Laughlin v. Metro Washington Airports Auth.*, 149 F.3d 253, 255, 259 (4th Cir. 1998). Presnell's complaints to her superiors and to the HR department about her compensation (and the compensation of the other GSMs) is neither "opposition" nor "participation" protected activity.

Complaining about conduct that is outside of the scope of Title VII does not constitute "opposition" protected activity. *See Conyers v. Va. Housing Dev. Auth*., 927 F. Supp. 2d 285, 295 (E.D. Va. 2013) ("[T]he employee must complain about activity that constitutes unlawful discrimination under Title VII"). No matter how unfair an employee's compensation may be, complaining about compensation unrelated to discriminatory conduct is not covered by Title VII. Nor is it "participation" protected activity. The record clearly establishes that Presnell and the other GSMs were unhappy with the changes in their compensation plan and she complained to management and HR for all of them. However, at no time did she complain about any unlawful discrimination prohibited by Title VII. Therefore, Presnell's compensation complaints are not "protected activity" sufficient to support a claim for unlawful retaliation.

Also, to prove retaliation in violation of Title VII, a plaintiff must prove that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer. *Univ. of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 359 (2013). Presnell has failed to provide any evidence of a causal connection between her alleged "protected conduct" (complaining about her compensation beginning in 2018) and Sharp terminating her in connection with an investigation into her misuse of a corporate credit card in May 2020. In sum, Presnell has failed to establish a prima facie case of retaliation under Title VII, both by failing to show that she engaged in "protected conduct" and that the adverse employment action taken against her was causally connected to that conduct. Accordingly, summary judgment will be granted to Sharp on Presnell's retaliation claim.

### C. Defendant's Counterclaims

Defendant seeks summary judgment on its state law counterclaims for conversion, embezzlement, breach of fiduciary duty and fraud. While the Court questions the merits of

Defendants' counterclaims, for the jurisdictional reasons discussed below it will simply deny the motion as to those claims and dismiss them without prejudice so they can be adjudicated (if Sharp decides to do so) in state court.

"Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Bender v. Williamsport Area Sch. Dist*., 475 U.S. 534, 541 (1986). No other matter can be decided without subject matter jurisdiction. *See United States v. Cotton*, 535 U.S. 625, 630, (2002); *U.S. v. Wilson*, 699 F.3d 789, 793 (4th Cir. 2012). Subject-matter jurisdiction cannot be conferred by the parties, nor can a defect in subject-matter jurisdiction be waived or forfeited by the parties. *Id.* A court must dismiss an action pursuant to Federal Rule of Civil Procedure 12(h)(3) "if the court determines at any time that it lacks subject matter jurisdiction," *see* Fed. R. Civ. P. 12(h)(3) and there is no presumption that a federal court has subject-matter jurisdiction. *See Pinkley, Inc. v. City of Frederick*, 191 F.3d 394, 399 (4th Cir. 1999).

Plaintiff alleges that the Court has subject matter jurisdiction based on Federal question jurisdiction, 28 U.S.C. § 1331. Federal question jurisdiction arises only from "those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. of the State of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 27–28 (1983). In this action, Plaintiff's claims of unlawful discrimination under the EPA and Title VII raise Federal questions. However, if the Court finds that Plaintiff's federal claims cannot proceed – as it has done above – then federal question jurisdiction is lacking, and the court may also decline to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims. *See* 28 U.S.C. § 1367(c)(3); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *ESAB*

*Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 394 (4th Cir. 2012); *Mann v. Power Home Solar, LLC*, No. 521CV00166KDBDSC, 2022 WL 602196, at *2 (W.D.N.C. Feb. 28, 2022).

Accordingly, having determined to dismiss all of the causes of action that support this Court's federal jurisdiction,[8] the Court lacks continuing subject matter jurisdiction over this action and declines to exercise supplemental jurisdiction over Defendant's state law claims in the absence of federal jurisdiction. Therefore, the Court will dismiss this action without prejudice, allowing the parties to contest the merits of Defendant's counterclaims in the North Carolina state courts if they cannot otherwise resolve their dispute.

## IV.    ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1.  Defendant's Motion for Summary Judgment (Doc. No. 29) is **GRANTED** as to Plaintiff's claims, but **DENIED** as to Defendant's Counterclaims;

2.  Summary Judgment in favor of Defendants is entered on Plaintiff's claims;

3.  In the absence of continuing federal subject matter jurisdiction, Defendant's Counterclaims are dismissed without prejudice; and

4.  The Clerk is directed to close this matter in accordance with this Order.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: December 14, 2022

Kenneth D. Bell
United States District Judge

---

[8] There is no federal jurisdiction over Defendant's counterclaims under the Court's "diversity" jurisdiction, 28 U.S.C. § 1332. While the parties may be diverse, the amount in controversy – just over $9000 – is well below the jurisdictional threshold set under Section 1332.

24